Alfonso GONZALEZ, Appellant,

v.

The STATE of Texas, Appellee.

No. 14–97–00745–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

Nov. 29, 2001.

Allen C. Isbell, Houston, for appellant.

William J. Delmore, III, Houston, for appellee.

Panel consists of Justices LEE, AMIDEI, and HUTSON–DUNN.[*]

## OPINION ON REHEARING

NORMAN LEE, Justice.

Alfonso Gonzalez appeals his conviction for engaging in organized criminal activity resulting in the theft of over $200,000. The jury assessed his punishment at 20 years imprisonment and a $10,000 fine. On appeal, appellant contends: (1) that the evidence is legally and factually insufficient to support the verdict; (2) that the trial court erred in disqualifying his original attorney; (3) that the trial court improperly commented on the constitutional rights of defendants; and (4) that the trial court erred in refusing to instruct the jury that a particular witness was an accomplice witness. We withdraw our prior opinion, overrule the motion for rehearing, and issue this opinion on rehearing. The judgment of the trial court is affirmed.

## I. Background

Appellant was charged by indictment with the offense of engaging in organized criminal activity resulting in the theft of over $200,000. Appellant's case was consolidated for trial with several co-defendants: Tan Kien Tu, Randy Jarnigan, Thomas Henry Gemoets, and Leighann Phan. At trial, the State presented evidence to show that the defendants were involved in a combination that stole over $200,000 from five insurance companies between October 9, 1993, and January 19, 1995. Fulfillment of the fraud scheme required, *inter alia*, the staging of car accidents and the falsification of injury and treatment reports, which were submitted to the insurance companies for payment.

Appellant and Gemoets were licensed physicians who treated patients at two separate clinics reportedly owned or financed by Tu. Jarnigan was an attorney who represented the alleged victims of the car accidents. The scheme also included a number of other people, not prosecuted in this consolidated trial, who were involved in activities ranging from posing as accident victims to preparing falsified documents. Percy Gonzalez, the key witness against the appellant, participated in a staged wreck and then subsequently worked at appellant's medical clinic falsifying documents. His testimony helped link the appellant to the combination. Tu, Jarnigan, and Gemoets have also appealed their convictions to this court, as follows: *Tan Kien Tu v. State*, C14–97–00745–CR; *Jarnigan v. State*, C14–97–00445–CR; *Gemoets v. State*, C14–97–00174–CR.

## II. Analysis

### A. Legal Sufficiency of the Evidence

#### 1. Standard of Review

Appellant first contends that the evidence was not legally sufficient to support the verdict. In reviewing legal sufficiency, we examine the evidence in the light most favorable to the verdict and ask whether any rational trier of fact could have found all of the elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Santellan v. State*, 939 S.W.2d 155, 160 (Tex.Crim.App.1997). We accord great deference to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences therefrom. *See Clewis v. State*, 922 S.W.2d 126, 133 (Tex.Crim.App.1996). We further pre-

---

[*] Senior Justices Norman Lee and D. Camille Hutson–Dunn and Former Justice Maurice

Amidei sitting by assignment.

sume that any conflicting inferences from the evidence were resolved by the jury in favor of the prosecution, and we must defer to that resolution. *See id.* at 133, n. 13. In conducting this review, the appellate court is not to re-evaluate the weight and credibility of the evidence, but must act only to ensure the jury reached a rational decision. *Muniz v. State*, 851 S.W.2d 238, 246 (Tex.Crim.App.1993); *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Crim.App.1988). In making its determination, the jury can infer knowledge and intent from the acts, words, and conduct of the accused. *Johnson v. State*, 32 S.W.3d 388, 393 (Tex. App.—Houston [14th Dist.] 2000, no pet. h.)(citing *Dues v. State*, 634 S.W.2d 304, 305 (Tex.Crim.App.1982)).

■ A defendant commits the offense of engaging in organized criminal activity if, intending to establish, maintain, or participate in a combination or in the profits of a combination, he commits or conspires to commit one or more of the listed offenses, including theft. TEX. PEN.CODE ANN. § 71.02(a)(1) (Vernon 1994 & Supp. 2000). A "combination" is defined as three or more persons who collaborate in carrying on criminal activities, although: (1) the participants may not know each other's identities; (2) membership may change from time to time; and (3) participants may stand in a wholesaler-retailer or other arm's-length relationship in illicit distribution operations. *Id.* § 71.01(a). A determination of guilt in regard to organized criminal activity requires two ingredients: (1) an intent to participate in a criminal combination and (2) the performance of some act, although not necessarily criminal in itself, in furtherance of the agreement. *See Barber v. State*, 764 S.W.2d 232, 235 (Tex.Crim.App.1988). Because direct evidence is rarely available to prove the existence of an agreement, circumstantial evidence is sufficient and is almost always needed. *Carlson v. State*, 940 S.W.2d 776, 779 (Tex.App.—Austin 1997, pet. ref'd). It is permissible to infer an agreement among a group working on a common project when each person's action is consistent with realizing the common goal. *McGee v. State*, 909 S.W.2d 516, 518 (Tex. App.—Tyler 1995, pet. ref'd).

## 2. The Evidence

The State presented evidence at trial to prove that appellant was part of an accident-fixing ring, which perpetrated thefts against insurance companies totaling over $200,000. Oscar Phu testified that in 1991 he was receiving compensation for referring accident victims to Tan Tu, who told Phu he was working for an attorney. In 1992, Phu began recruiting people to be in fake auto accidents staged by Tu. Phu described the methods and procedures employed by Tu, including the use of particular attorneys and medical doctors to make the false insurance claims. He explained that there was always a need for at least two doctors because there were two cars and two groups of people in each accident. Phu stated that Tu told him that the doctors would be paid, usually in cash, 40 to 50 percent of the amount recovered from the insurance companies on the medical bills.

Phu further testified that in 1993 Tan Tu split with a business associate and subsequently formed a new ring. He purchased the clinic where Gemoet's worked and financed appellant's clinic. Tu told Phu that appellant's clinic was actually run by Angie Mong. Phu stated that Tu asked him to train Angie in the insurance scheme, and Tu referred to her as Phu's replacement, because Phu continued to work for Tu's former associate.

Charles Patberg, a Harris County Sheriff's deputy, testified that he first learned of the insurance fraud ring from an informant in March 1994. The informant intro-

duced him to Angie Mong, who explained to him how the insurance scam worked. Basically, two vehicles would be crashed together at a remote location, then the vehicles and the resulting debris would be moved to an intersection, where the accident would be recreated and the police called. When the police arrived, one of the "drivers" would admit fault in the accident. Patberg himself participated in a staged accident, which was covertly videotaped by a member of the Auto Crimes Task Force and shown to the jury. Patberg was paid $600 for his involvement. After the accident, Patberg went to see both Dr. Gemoets and the appellant. He said that Angie asked him to see appellant after he had already seen Gemoets because there had been some kind of a mix-up at Gemoets' office. She offered him a bonus of $60 to see appellant, and she paid it at appellant's office before the examination. Patberg testified that the appellant asked him what happened and then had him do some basic motion exercises. The whole examination took approximately five to ten minutes. Patberg told the appellant that he was in a car accident. Appellant asked him if he wanted any medication, and Patberg asked for and received a prescription. Appellant did not offer a diagnosis, did not request a follow-up visit, and did not prescribe any physical therapy. Patberg ultimately participated in a total of four staged accidents.

Mary Pressley testified that she infiltrated the ring as a paid informant for Deputy Patberg. She participated in a staged accident and then went to appellant's clinic, where she was examined by Sekibo Williams, who was a doctor from another country and was not licensed in Texas. He examined her and then wrote out a prescription which appellant signed. Manuel Cordero testified that he saw appellant after he participated in a staged accident. He complained to the appellant of neck pain and the appellant had him remove his shirt and then felt his shoulders. Cordero said the whole examination took five minutes at the most. After the examination, he was paid by Angie.

The State's medical expert testified that certain medical reports generated from appellant's office were fraudulent. He based his conclusion largely on the striking uniformity of symptoms and the listing of inappropriate treatments. The State also introduced into evidence a "Money Trails" binder, which described and traced the money received for each of eight staged accidents, three of which were linked to appellant as the medical provider.

The main witness against the appellant was Percy Gonzalez. Percy testified that he first became involved in the scam when his roommate convinced him to be a passenger in one of the staged accidents. At the time of the wreck, Percy claims he was eating in a restaurant and was not in the vehicle. He stated that Angie Mong was at the scene of the accident before and after the wreck took place, and she handled the paperwork and paid the participants. Percy said he had to sign a power of attorney and some blank forms. At this point in the testimony, the prosecutor showed several documents and insurance checks to Percy that were signed using his name but which he denied signing.

Percy further testified that he was directed to go to appellant's office the next day. At the office, Percy filled out additional paperwork and then appellant examined him. Percy described the exam as "a quick look" and said that the only time appellant touched him was to take his pulse. Appellant did not have Percy bend over or otherwise test his range of back motion, nor did appellant prescribe any medication that Percy could recall. Percy admitted that he did not tell the appellant the accident was staged, but Percy also

said he did not tell the appellant he was injured and the appellant did not ask if he was injured. Percy said that he never told anyone at the appellant's office that he was injured but that Leighann Phan, the secretary and receptionist, told him that he was injured. Percy reported that she said, "No pain, no money," and she indicated on a form that his lower back, upper back, and neck were injured. Percy further stated that, after the examination, appellant did not prescribe any therapy nor did he request to see Percy again for a follow-up visit.

After that, Angie and Thi Binh Luong asked Percy, who was knowledgeable about computers, to help them transfer data between two computers. This eventually lead to a job generating medical narratives and billings on the WordPerfect and FoxPro computer programs at the medical clinic used by appellant.[1] Percy estimated that, at the time he started the job, there was a backlog of approximately 400 files. Initially, Thi, the office manager, explained his job duties, which basically entailed generating narratives and bills for each file. Percy stated that the reports were created by randomly selecting from groups of different neck and back injuries, and Thi told him that all the bills had to have lower back pain because that paid the most, then, to give some diversity, they would add pain to an arm or leg or something else.

Percy further testified that Leighann and the appellant helped teach him how to fill out the narratives and billings, as Thi usually wasn't in the office. Percy recalled one particular incident when Leighann noticed he was putting down ultrasound procedures as having been given to children. Leighann told him not to do that, but she was unclear as to why. Percy then asked the appellant about it, and appellant explained that ultrasound could retard a child's growth and they could be sued for using it. He also said that pregnant women should not receive it either, because it could cause them to miscarry. Percy additionally stated that appellant told him to not go over $1,000 on children and appellant counseled him on the proper numbers to put down for certain physical examination statistics, such as arm refraction and respiration. Percy specifically said that he made it clear to appellant that he was generating the narratives.

Percy explained that he received the medical files he was to work on from Leighann. The files came with a calendar showing the dates of supposed office visits to see appellant, and they each had a note specifying how much the accident was worth. Percy would then try to get as close to the amount as he could with the treatments that he assigned to the person. He stated that on a couple of occasions he was present when Leighann discussed the value of an accident with an attorney before she put a figure on the file. After the narratives and billings were completed, copies were made and sent to the attorney in charge of the particular case. The State introduced into evidence a collection of blank signed forms that Percy testified were similar to the ones he filled out at the appellant's clinic, including a sample calendar which contained Leighann's handwriting.

Percy said that he remembered a truly injured person once came into the clinic,

---

1. Appellant maintained a medical office in the same building as a clinic where he also saw patients. The State offered evidence connecting him to both locations. Percy testified that when he was first a participant in the staged accident he went to the appellant's office, but later, when he took the job working on the files, he worked solely at the clinic. Oscar Phu testified that Tan Tu claimed he financed appellant's clinic and Angie ran it.

but they sent him to the hospital because they didn't know how to take care of him. Percy also stated that he saw people return to the clinic sometimes with a different driver's license and under a different name.

Percy further testified that Angie is the one that brought the cases into the office. The files were coded with the initials of the "runner," i.e. the person who arranged the accident. He said that appellant and Tay Binh Luong had an arrangement under which appellant was to receive 50 percent of the medical bills and Angie and "Thi" were to receive the other 50 percent.[2] Percy stated that he talked to appellant about the arrangement and the appellant was not happy with it and thought he should be getting more because he was providing his name and the claim. At some point, Percy himself began recruiting people to take part in the staged accidents, but the files and the money still went through Angie. Percy later met Tan Tu, whom Angie introduced as her boss. Percy admitted that although Tan Tu did come to the clinic at least a couple of times, he never actually saw Tan Tu and the appellant together.

Percy further testified that a rubber stamp was used to put appellant's name on the medical bills. He said that he was present on four to five occasions when appellant saw Leighann use the stamp, and the appellant did not tell her to stop. Percy also explained that appellant's signature was recorded in the computer and could be generated in that manner.

### 3. Analysis

In short, the evidence is sufficient to demonstrate that Angie, who was working with Tan Tu, sent several "patients," who had participated in staged car accidents, to see the appellant; that, although the appellant did not actually treat the alleged victims, he, or people under his direction, submitted false medical narratives and bills that were used to illegally obtain compensation from insurance companies; and that appellant received 50 percent of the proceeds from the files that came through his office. We find that a rational jury could have concluded appellant "participated" in a group of three or more, in which the members intended to work together in a continuing course of criminal activities. *See Dowdle v. State,* 11 S.W.3d 233, 235–236 (Tex.Crim.App.2000).

Appellant further specifically contends that the evidence is legally insufficient to sustain his conviction because the application paragraph of the trial court's charge required the jury to find that appellant did "commit the offense of theft by unlawfully appropriating ... money ... of the total value of over two hundred thousand dollars ($200,000.00)," and the State only proved that appellant's participation directly generated $78,651.27.[3] The State asserts that a "hypothetically correct" charge under *Malik v. State,* 953 S.W.2d 234 (Tex.Crim.App.1997), would charge that appellant, acting as a party together with other members of the combination, committed theft of the total amount of over $200,000.

We agree with the State and find that, under the rule of *Malik,* a hypotheti-

2. The court reporter's transcription records the prosecutor as saying "Tay" and Percy saying "Thi" when they appear to be referring to the same person. The prosecutor later verified with Percy that both names referred to the same individual, i.e. the office manager.

3. This total is derived by adding together the amounts actually paid by insurance companies on false accident claims that included medical bills submitted over the appellant's signature.

cally correct jury charge in this case would have applied the law of the parties to the facts. Such a charge would have been authorized by the indictment, not unnecessarily an increase the State's burden of proof or unnecessarily restricting of the State's theories of liability, and would have adequately described the particular offense for which the defendant was tried. *See id.* at 240; *see also Blanco v. State,* 962 S.W.2d 46, 46 (Tex.Crim.App.1998)(explaining that *Malik* rule is not mere dicta). In *Nesbitt v. State,* 958 S.W.2d 952 (Tex. App.—Beaumont 1998, no pet.), the court of appeals found that the hypothetically correct jury charge would have applied the law of parties to the facts in that case. On that basis, the court held that the evidence was legally and factually sufficient to show that appellant was guilty as a party to the underlying offense of murder while engaging in organized criminal activity. *See id.* at 954–55; *see also Nguyen v. State,* 21 S.W.3d 609, 613 (Tex.App.—Houston [1st Dist.] 2000, pet. ref'd)(also applying *Malik* in the law of parties context). In three companion cases involving convictions for engaging in organized crime to commit murder, the Beaumont Court of Appeals held that the parties charge applied to the appellants' acts causing the death of a victim not to their intent to participate in a combination, and thus the trial court did not err in submitting a law of parties instruction. *See Campbell v. State,* 18 S.W.3d 914, 920 (Tex.App.—Beaumont 2000, pet. ref'd); *Brumfield v. State,* 18 S.W.3d 921, 927–928 (Tex.App.—Beaumont 2000, pet. ref'd); *Armstrong v. State,* 18 S.W.3d 928, 932–933 (Tex.App.—Beaumont 2000, pet. ref'd.). *See also Johnson,* 32 S.W.3d 388, 392–394 (law of parties instruction applied to acts in committing aggravated robbery and not to intent to participate in a combination).

The evidence in the present case was sufficient for the jury to infer that appellant had an agreement with several others, including Angie, Tay Binh Luong, Percy Gonzalez, and Tan Tu or his agents, to work together in a common scheme, and that appellant's role was to generate, and lend his professional credibility to, false medical narratives and bills. Appellant's false reports directly generated over $78,000 of the over $200,000 stolen by the combination. Along with the instruction on a combination, a hypothetically correct charge would have authorized the jury to find appellant guilty if he committed theft as a principal or as a party by aiding or encouraging other members of the combination in the commission of theft of money over the total value of $200,000. This would allow the jury to apply the law of parties to the underlying offense of theft, and not simply to appellant's intent to participate in a combination.

We find that applying the law of parties to the facts in this case is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *See Malik,* 953 S.W.2d at 240. We hold that the evidence is legally sufficient to sustain appellant's conviction. Accordingly, we overrule this point of error.

**B. Factual Sufficiency**

**1. Standard of Review**

Appellant next challenges the factual sufficiency of the evidence to support the guilty verdict. In reviewing factual sufficiency, we examine all of the evidence without the prism of "in the light most favorable to the prosecution" and set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Johnson v. State,* 23 S.W.3d 1, 7 (Tex.Crim.App.2000). We consider all of the evidence in the

record and not just the evidence which supports the verdict. *Santellan,* 939 S.W.2d at 164 (Tex.Crim.App.1997). The court is authorized to disagree with the jury's determination, even if probative evidence exists which supports the verdict. *Clewis,* 922 S.W.2d at 133 (Tex.Crim.App. 1996). However, factual sufficiency review must be appropriately deferential so as to avoid the appellate court's substituting its own judgment for that of the fact finder or substantially intruding upon the jury's role as the sole judge of the weight and credibility of witness testimony. *Johnson,* 23 S.W.3d at 7. Unless the record clearly reveals that a different result is appropriate, we must defer to the jury's determination concerning the weight given to contradictory testimony. *Id.* at 8.

### 2. Analysis

■ Appellant did not call any witnesses on his own behalf. The cross-examination of Percy Gonzalez, the State's key witness against the appellant, attempted to show a motive for false testimony by raising the existence and details of his plea bargain agreement with the State. The cross examination also attempted to portray Percy as a major player in the criminal scheme. Although the jury could certainly have considered the plea agreement and Percy's role in the alleged crime in assessing the weight to be given his testimony, such an assessment is well within the province of the jury and we will not second guess it on appeal. *See Johnson,* 23 S.W.3d at 7 (jury is sole judge of the weight and credibility of witness testimony).

Percy's testimony, as detailed above, was sufficiently direct and complete to support the conclusion that appellant was an active participant in the scheme to steal from the insurance companies. Percy's testimony was adequately supported by the general evidence of the scheme, also detailed above; by the testimony of Oscar Phu and other witnesses, which further tied appellant to the scheme; by the State's medical expert's testimony indicating that medical reports generated at appellant's office and clinic were fraudulent; by the voluminous exhibits establishing the procedures and results of the combination; and by the fact that many of the documents directly reflect Percy's contentions and even include the appellant's signature, albeit not original.

Appellant specifically contends that the State's medical expert's testimony refuted Percy Gonzalez's claim that appellant aided him in completing the narratives and billings. This contention is based on the expert's testimony that many of the entries in these reports used terminology and procedures that a medical doctor would not use for such cases. The contention, however, is without merit. Percy Gonzalez's actual testimony was that appellant helped instruct him on how to fill out the forms and that he occasionally asked the appellant questions about particular entries. There was no contention that appellant himself prepared the narratives or billings or that he conducted a line-item edit of the documents. Furthermore, contrary to appellant's assertion, Percy's testimony regarding appellant's role in the preparation of the narratives and bills was corroborated by the use of appellant's signature on the forms, by the evidence demonstrating that these activities occurred in the appellant's office and clinic, and by the evidence tying appellant into the combination itself.

Additionally, appellant contends that there was no evidence to corroborate Percy's assertion that appellant shared in the proceeds of the criminal scheme. However, Oscar Phu testified that Tan Tu was financing appellant's clinic and that the doctors at the clinics used by Tan Tu were

receiving a share of the proceeds from the insurance payments. Phu also testified that the doctors connected to the scheme were usually paid in cash. Furthermore, an analysis of the clinic's financial records indicated that appellant did receive two checks drawn on the clinic bank account totaling $5,000. The possibility that appellant may have received other proceeds in cash could have been considered by the jury but was not necessary to convict the appellant. The evidence is sufficient to support the conclusion that the appellant participated in the criminal scheme and profited therefrom.

The evidence was factually sufficient to demonstrate the existence of the scheme and the appellant's role in it. We therefore find that the verdict was not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Johnson,* 23 S.W.3d at 7. This point of error is overruled.

### C. Attorney Disqualification

Appellant next contends that in disqualifying his original attorney, Ralph Gonzalez, the trial court abused its discretion and deprived him of his constitutional right to counsel of his own choosing. *See* U.S. CONST. amend. VI; TEX. CONST. art. I, § 10.[4] The trial court apparently considered Ralph Gonzalez a possibly key witness in the case because he had several conversations, in person and on the telephone, with Percy Gonzalez, an arrested coconspirator and, as discussed above, the State's key witness against appellant. Percy claimed that Ralph Gonzalez attempted to buy his testimony on behalf of the appellant.

### 1. Legal Framework

The Sixth Amendment guarantees a criminal defendant the right to be represented by the retained counsel he prefers. U.S. CONST. amend. VI; *Wheat v. U.S.,* 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). This right is not absolute, however, but can be overridden by important considerations relating to the integrity of the judicial process and the fair and orderly administration of justice. *See Wheat,* 486 U.S. at 158–60, 108 S.Ct. 1692; *Webb v. State,* 533 S.W.2d 780, 784 (Tex.Crim.App.1976). However, a court should not reject a defendant's chosen counsel on "[u]nsupported or dubious speculation." *Wheat,* 486 U.S. at 166, 108 S.Ct. 1692 (Marshall, J., dissenting). When a trial court unreasonably or arbitrarily interferes with the right to choose counsel, its actions rise to the level of a constitutional violation. *U.S. v. Collins,* 920 F.2d 619, 625 (10th Cir.1990). Whether the court has abused its discretion, and thus acted unreasonably or arbitrarily, must be gleaned from the facts and circumstances of each particular case. *See Wheat,* 486 U.S. at 165–66, 108 S.Ct. 1692; *Kozacki v. Knize,* 883 S.W.2d 760, 763 (Tex.App.— Waco 1994, no pet.).

In determining whether counsel should be disqualified because of being a potential witness, Texas courts utilize Rule 3.08 of the Texas Disciplinary Rules of Professional Conduct. *House v. State,* 947 S.W.2d 251, 252–53 (Tex.Crim.App.1997); *Anderson Producing Inc. v. Koch Oil Co.,* 929 S.W.2d 416, 421 (Tex.1996). The rule does not present the disqualification standard but does provide considerations relevant to the determination. *Anderson Producing,* 929 S.W.2d at 421; *see also House,* 947 S.W.2d at 252 (citing comment 10 to

---

**4.** Because appellant has not separately briefed his state and federal constitutional claims, we assume that he claims no greater protection under the state constitution than

that provided by the federal constitution. *See Johnson v. State,* 47 S.W.3d 701, 706 (Tex. App.—Houston [14th Dist.] 2001, no pet. h.).

the rule, which states: "this rule may furnish some guidance"). The rule states as follows:

### Rule 3.08. Lawyer as Witness

(a) A lawyer shall not accept or continue employment as an advocate before a tribunal in a contemplated or pending adjudicatory proceeding if the lawyer knows or believes that the lawyer is or may be a witness necessary to establish an essential fact on behalf of the lawyer's client, unless:

(1) the testimony relates to an uncontested issue;

(2) the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony;

(3) the testimony relates to the nature and value of legal services rendered in the case;

(4) the lawyer is a party to the action and is appearing pro se; or

(5) the lawyer has promptly notified opposing counsel that the lawyer expects to testify in the matter and disqualification of the lawyer would work substantial hardship on the client.

(b) A lawyer shall not continue as an advocate in a pending adjudicatory proceeding if the lawyer believes that the lawyer will be compelled to furnish testimony that will be substantially adverse to the lawyer's client, unless the client consents after full disclosure.

(c) Without the client's informed consent, a lawyer may not act as advocate in an adjudicatory proceeding in which another lawyer in the lawyer's firm is prohibited by paragraphs (a) or (b) from serving as advocate. If the lawyer to be called as a witness could not also serve as an advocate under this Rule, that lawyer shall not take an active role before the tribunal in the presentation of the matter.

TEX. DISCIPLINARY R. PROF'L CONDUCT 3.08, *reprinted in* TEX. GOV'T CODE ANN. title 2, subtitle G, app. A (Vernon 1998).

The rule addresses at least two concerns that arise when a lawyer representing a party in a proceeding becomes a likely witness in the same proceeding. *Schwartz v. Jefferson*, 930 S.W.2d 957, 960 (Tex. App.—Houston [14th Dist.] 1996, no pet.). The primary concern is that the client's case may be harmed by counsel assuming the dual role of advocate-witness. *House*, 947 S.W.2d at 253; *see also* Rule 3.08, comments 2, 3, 9, 10. But also of concern is the possible confusion that can result for the trier of fact when an attorney in the case testifies. *See Anderson Producing*, 929 S.W.2d at 422; *House*, 947 S.W.2d at 255 (Baird, J., concurring and dissenting); Rule 3.08, comment 4. Providing greater heft to the latter concern is the fear that a jury may give undue weight to the attorney's testimony, which may hamper the opposing party in challenging the credibility of the testimony. *See Ayres v. Canales*, 790 S.W.2d 554, 558 (Tex.1990)(citing Brown & Brown, Disqualification of the Testifying Advocate–A Firm Rule?, 57 N.C.L.Rev. 597 (1979)).

 While the disciplinary rules should not be used as a tactical weapon to disqualify opposing counsel, counsel may be disqualified where the party seeking disqualification can demonstrate actual prejudice resulting from opposing counsel's service in the dual role of advocate-witness. *House*, 947 S.W.2d at 251; Rule 3.08, comment 10; *see also Brown v. State*, 921 S.W.2d 227, 229 (Tex.Crim.App.1996)(counsel should not be disqualified *solely* for violation of a disciplinary rule). The appellate standard for reviewing a trial court's disqualification of defense counsel is abuse of discretion.

*See, e.g., Schwartz,* 930 S.W.2d at 958; *United States v. Peng,* 766 F.2d 82, 87 (2d Cir.1985)[5]; *see also Harrison v. State,* 788 S.W.2d 18, 19 (Tex.Crim.App.1990)(holding that trial court abused its discretion in declaring mistrial when possibility arose that defense counsel would be called as a witness).

### 2. Evidentiary Hearing

At the hearing on the motion to disqualify, Percy Gonzalez testified that, after he was arrested, indicted, and released, he went to see the appellant, who referred him to Ralph Gonzalez. Percy further stated that he and Ralph had approximately three telephone conversations before they met in person. The first face-to-face meeting included Percy, Ralph, appellant, and Marco Vargas, a friend of Percy's. Percy stated that they discussed his possible testimony and who they were going to blame for the "thing."

Percy told them he needed a lawyer, and Ralph said that he couldn't represent Percy because it would create a conflict of interest. Ralph also said that it would cost about two to three thousand dollars to hire another attorney. Percy told them he needed $10,000. According to Percy, Ralph Gonzalez then told him that if he cooperated and helped them out and did as he was told—which was to blame Thi for the whole thing—appellant would give him a $3,000 check and make payments for the rest. Percy testified that he later had his friend Marco pick up a check from appellant for $3,000. A check made out to Marco was produced to the court. Percy said that he wanted the check made out to Marco so it would not look like a payoff.

Percy further stated that he and Ralph met on another occasion when Ralph told him that unless he helped make a tape exonerating appellant, for presentation to the State Medical Examiner's Board, Percy would not get the remaining $7,000. Ralph later called to arrange the taping, but the conversation ended badly, and the tape was never made. This part of Percy's testimony was corroborated, to a degree, by a representative of the Medical Board, who testified that Ralph Gonzalez did inform the board that he was preparing a videotaped statement to exonerate the appellant.

Marco Vargas testified at the hearing as well. His testimony supported Percy's in several respects, including that the plan was to blame Thi and that payments were to be made to keep Percy quiet in regard to the appellant. Vargas also stated that he picked up a check from the appellant for Percy.

Ralph Gonzalez admitted to the court that meetings and telephone conferences did occur between himself and Percy. He stated that, initially, Percy stressed that the appellant had a moral obligation to pay for his attorney because appellant was Percy's employer. Ralph Gonzalez says that Percy later changed the tenor of his position and began threatening to testify against appellant if he did not give Percy $10,000. Ralph said that he reproached Percy and told him that they were not going to buy his testimony. Ralph further stated that he notified an assistant district attorney that Percy was trying to solicit money in exchange for favorable testimony.

### 3. Analysis

■ When a lawyer's testimony relates solely to an uncontested issue or to a mere matter of formality, there is little concern

---

**5.** The *Peng* case, cited throughout the discussion on this point of error, utilizes N.Y.Jud. L.Code of Prof'l Responsibility, DR–5– 101(B)(McKinney 1975), a provision similar in scope and application to Rule 3.08. *See id.,* 766 F.2d at 87.

for the possible confusion generated by undertaking the dual role of advocate-witness. Rule 3.08, comment 4. However, when the testimony goes to a controversial or contested matter, combining the roles can unfairly prejudice the opposing party. *Id.* It would not be clear in that situation whether statements made by the advocate-witness should be taken as proof or as an analysis of the proof. *Id.* In the present case, the appellant faced a corroborated allegation of having bribed the primary witness against him in a fraud prosecution. It is clear from the record of the evidentiary hearing that the bribery issue was hotly contested and very controversial, and it was certainly not a mere matter of form. The proceedings run for 210 pages of the record, with most of that amount taken up by witness testimony. Ralph Gonzalez himself testified, mostly in narrative form, for 22 pages. His testimony was, in important respects, directly contrary to that of the accusing witnesses, Percy Gonzalez and Marco Vargas. Ralph Gonzalez's argument and testimony in the hearing further demonstrated that he considered the denial of these allegations to be paramount to the defense. The trial judge, in fact, called Ralph: "the most important witness that Dr. Gonzalez has." We find that the record supports the conclusion that Ralph may have been a necessary witness in this case.

Appellant contends, however, that the bribery issue could have been adequately contested by means other than the testimony of Ralph Gonzalez. Appellant states that Ralph represented to the court that he taped four or five of the telephone conversations he had with Percy, and he showed the court what he represented to be a transcript of one of the conversations.

He admitted, however, that he did not tape any of the meetings that occurred in person. He also admitted that, prior to the hearing, he had refused to turn over the tapes to the prosecution, claiming that they were work product and not evidence. In fact, it is undisputed that Ralph Gonzalez never turned over any of the actual tapes either to the prosecution or to the court. Furthermore, during his testimony at the hearing, he specifically stated: "I do not intend to introduce those tapes."

■ Nevertheless, Gonzalez suggested to the trial court, and appellant now claims on appeal, that to the extent appellant would have needed to rebut or impeach Percy's allegations of witness tampering, the tapes of the conversations would have sufficed and Ralph Gonzalez would have not needed to testify. We first note that in order to fully consider this argument, the trial court, and this court, would need to actually hear the tapes or see certified transcripts of the tapes. Since appellant never attempted to make the tapes or the alleged transcripts a part of the record, he has waived any argument on the basis of what the tapes may contain. *See Sandles v. State,* 887 S.W.2d 252, 254 (Tex.App.—Beaumont 1994, no pet.)(appellant waived argument based on affidavit which was not introduced in trial court); *see also Salazar v. State,* 5 S.W.3d 814, 816 (Tex.App.—San Antonio 1999, no pet.)(burden is on appellant to bring forth sufficient appellate record).[6]

Even if the tapes were in the record and supported the appellant's contentions, it was admitted that additional untaped conversations occurred between Percy and Ralph, including the face-to-face meeting wherein the actual payment of money was arranged. Ralph Gonzalez specifically

---

6. There may also be additional problems raised by the substitution of counsel's voice on the tape or his words in the transcript in place of his own live testimony; however, we need not reach those issues in this case.

stated to the trial court that he would not offer testimony, or other evidence, to rebut the statements Percy Gonzalez might make regarding the unrecorded face-to-face meetings. He claimed instead that he would tear down Percy's credibility on this issue by forceful questioning on cross-examination. However, if Ralph Gonzalez continued as counsel without taking the stand but questioned Percy specifically about the substance of conversations between the two of them, the jury may well have interpreted his questions, and his subsequent jury argument, as testimony conveying his own version of the facts surrounding the meetings.[7] See Peng, 766 F.2d at 86. Furthermore, since Ralph would have been an unsworn witness, he would not have been subject to cross-examination, and thus the actual prejudice to the State's case would have been even more severe. See id. Lastly, whether or not Ralph Gonzalez would have put himself on the stand is not the deciding factor in our determination, as the State had the option of calling him as well. See, e.g., Rule 3.08, comment 10 (a lawyer should not seek to disqualify opposing counsel by calling him or her as a witness unnecessarily).

The evidence introduced at the hearing supports the finding that Ralph Gonzalez was a key witness regarding the controversial and contested allegation of witness tampering against himself and his client. See House, 947 S.W.2d at 253; Schwartz, 930 S.W.2d at 960; see also Rule 3.08, comments 2, 3, 9, 10. His testimony, and/or his questioning of other witnesses, including Percy and Marco Vargas, probably would have resulted in considerable confusion for the trier of fact. See Anderson Producing, 929 S.W.2d at 422; House, 947 S.W.2d at 255 (Baird, J., concurring and dissenting); Rule 3.08, comment 4. His testimony, therefore, was not simply on a matter of formality or on an uncontested issue. See RULE 3.08(a)(1) and (2) and comment 4.

■ Appellant additionally contends that by disqualifying his attorney for meeting with Percy Gonzalez, the court impinged on his right to have his counsel interview prospective witnesses. Appellant cautions that if defense counsel has to be forever wary of disqualification for such meetings, it will seriously erode their ability to investigate and defend criminal prosecutions. In Peng, 766 F.2d 82, the court confronted a similar situation. Peng argued that his attorney's meeting with a key government witness was simply an exercise of his right to interview prospective witnesses. In approving counsel's disqualification, the Second Circuit emphasized that the meeting with the witness was in the way of negotiations concerning the very subject matter of the fraud prosecution. See id. at 83, 87. We agree with the Peng court's reasoning. While a concern could be raised that disqualifying counsel simply because a witness claimed that the counsel tried to buy his testimony would put too much power in the hands of witnesses, in the present case there is ample proof that the meetings between Ralph and Percy Gonzalez were more than simple witness interviews. Appellant and Ralph Gonzalez have admitted that meetings occurred wherein the subject of monetary payments arose and, in fact, money

---

7. It is virtually inconceivable that Ralph Gonzalez could have effectively questioned Percy without his role in the meetings becoming obvious, as the following excerpt from Ralph's cross-examination of Percy at the hearing illustrates:

Q. So basically someone is buying your testimony here today; is that what you're saying?
A. So basically you tried to buy my testimony here today, yes.

changed hands after the second meeting. Marco Vargas also testified in support of Percy's allegations. This is enough corroboration of the witness's claim to make the question of whether the appellant and Ralph Gonzalez attempted to buy Percy's testimony a viable issue on which Ralph would likely need to testify.

■ Finally, the fact that Ralph was never actually called as a witness does not change the analysis here because the contention that the witness tampering allegation might be too prejudicial to be included in the trial was not argued or decided until well into the proceedings before the jury. At the time the judge made the disqualification ruling, this issue was still a viable part of the case and a very real probability existed that Ralph Gonzalez would be called upon to testify concerning the alleged bribery of a key witness. Based on the court's eventual exclusion of the bribery evidence, it is conceivable that appellant could have: (1) urged a motion to exclude testimony on the subject of bribery prior to, or coterminous with, the motion to disqualify, or (2) brought a motion to reinstate Ralph Gonzalez as counsel after the evidence on the issue was excluded. Appellant, however, failed to undertake either of these options.

Based on the foregoing, we find that the trial court did not abuse its discretion in disqualifying Ralph Gonzalez, as there was sufficient proof of actual prejudice to the prosecution resulting from Gonzalez acting in the dual role of advocate-witness. *See House,* 947 S.W.2d at 251. Appellant's Sixth Amendment rights were not violated. *See Wheat,* 486 U.S. at 165–66, 108 S.Ct. 1692. Accordingly, we overrule this point of error.

### D. Judge's Comments

Appellant's fourth point of error complains that the trial court erred in improperly commenting on the constitutional rights of the accused. The trial judge explained to the jury panel before voir dire commenced that the burden of proof is on the State to prove the defendants' guilt beyond a reasonable doubt and that the defendant does not have to testify. He further explained: "[i]f the evidence shows that there were witnesses available to the defense and they didn't call them [...] that might be considered by you, but the defense doesn't have to put on anything." After a break, counsel for one of the co-defendants objected to the judge's comments on the jury being able to consider the failure to call certain witnesses, but the court overruled the objection. Later, during voir dire examination, a defense attorney asked a veniremember whether she understood that a defendant does not have to bring any evidence and the burden of proof is on the State. The veniremember stated that she understood, but she would want to hear some evidence. The trial judge then further explained that although a defendant does not have to testify, "his failure to call those witnesses who might know something about the facts is not placed in the same category as the failure of the defendant to testify." Again, a defense attorney objected and moved for a mistrial, and the court overruled the objection. At trial, appellant did not call any witnesses on his behalf.

■ On appeal, appellant contends that the judge's statements were impermissible comments on the weight of the evidence in violation of article 38.05 of the Texas Code of Criminal Procedure and that they were reasonably calculated to injure the defendants' rights and benefit the State. *See* TEX.CODE CRIM. PROC. ANN. Art. 38.05 (Vernon 1979); *Clark v. State,* 878 S.W.2d 224, 226 (Tex.App.—Dallas 1994, no pet.). It is well established that a prosecutor may comment on the failure of a defendant to call witnesses and may even

argue that the reason for the failure was the defendant's knowledge that the testimony would be unfavorable. *See Albiar v. State*, 739 S.W.2d 360, 362–63 (Tex.Crim. App.1987). The trial judges comments, therefore, did not impermissibly comment on the weight of the evidence but merely helped define the parameters of the conclusions that the jury could draw from the evidence. In short, he was explaining the applicable rules of criminal law. *See Williams v. State*, 834 S.W.2d 502, 505 (Tex.App.—Fort Worth 1992, pet. ref'd). Accordingly, we find that the court's remarks were not reasonably calculated to harm the appellant or to benefit the State. This point of error is overruled.

### E. Accomplice Witness

In his sixth and seventh points of error, appellant contends that the trial court erred in refusing to instruct the jury that Mary Pressley was an accomplice witness, either as a matter of law or as a matter of fact. Article 38.14 of the Texas Code of Criminal Procedure provides that: "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed. . . ." TEX.CODE CRIM. PROC. ANN. Art. 38.14 (Vernon 1979). The rationale behind this rule is that accomplice witnesses may often have incentives to lie, such as to avoid punishment or to shift the blame to another. *Blake v. State*, 971 S.W.2d 451, 454 (Tex.Crim.App.1998).

A person is considered an accomplice if he or she could be prosecuted for the same offense as the defendant or for a lesser included offense. *Id.* at 454–55. In other words, a person is an accomplice if there is sufficient evidence connecting them to the criminal offense as a "blameworthy participant." *Id.* at 455; *Matthews v. State*, 999 S.W.2d 563, 565 (Tex.App.—Houston [14th Dist.] 1999, pet. ref'd). The test is whether there is sufficient evidence in the record to support a charge against the witness alleged to be an accomplice. *Blake*, 971 S.W.2d at 455. If the evidence clearly shows that the witness was an accomplice as a matter of law, the trial court must so instruct the jury. *Id.* However, if the evidence on the issue is conflicting, the court should present the matter for consideration by the jury. *Id.*

We must now examine the record for evidence that Mary Pressley participated in the crime charged against appellant. *See id.* Harris County Sheriff's Deputy Charles Patberg testified that he first learned of the insurance fraud ring from Kenneth Johnson, an informant on another matter. Patberg said that he asked Johnson to involve himself in the group and inform on its activities. Mary Pressley was Johnson's girlfriend. She testified that she was first approached about participating in a staged accident by a Michael Ford, but she told him she was not interested because it was illegal. Johnson, however, decided to participate in the staged accident. Pressley managed to contact Patberg and told him of Johnson's plan. Patberg testified that he called Johnson and told him: "Listen, if you have the staged accident, you're on your own. We don't have any control over it." [8]

Pressley further testified that she decided to go ahead and participate in the accident so that she "could let Charlie and them know how they did these wrecks."

---

8. Contrary to appellant's contention, Deputy Patberg did not testify that he told Johnson he would be "guilty of unlawful activity" if he participated in the accident. That phrasing was contained in a question by defense counsel on cross examination to which Patberg did not give an affirmative response. Likewise, at no point did Patberg testify that he considered Johnson or Pressley's participation to be illegal.

She specifically stated that she was not doing it for the money, and, in fact, she did not directly receive any money for participating.[9] Pressley then became a paid informant for the sheriff's office. She managed to infiltrate the insurance fraud ring and report her observations to deputy Patberg, who himself later participated in a staged accident.

■ The evidence does not support the contention that Pressley could have been prosecuted for the same offense as appellant or even a lesser included offense. *See Blake,* 971 S.W.2d at 454–55. A person commits the offense of engaging in organized criminal activity if, intending to establish, maintain, or participate in a combination or in the profits of a combination, he or she commits or conspires to commit one or more of the listed offenses, which include theft. TEX. PEN.CODE ANN. § 71.02(a)(1) (Vernon 1994 & Supp.2000). A person commits theft if he or she unlawfully appropriates property with the intent to deprive the owner of the property. *Id.* § 31.03(a).[10]

■ It is well settled that a "volunteer" working on behalf of a criminal investigation is not an accomplice witness so long as he or she does not bring about the crime but merely intends to obtain evidence to be used against those committing the crime. *See Parr v. State,* 606 S.W.2d 928, 929 (Tex.Crim.App.1980); *Alexander v. State,* 168 Tex.Crim. 288, 325 S.W.2d 139, 140 (1959); *see also Bacon v. State,* 762 S.W.2d 653, 656 (Tex.App.—Houston [14th Dist.] 1988, pet. ref'd)(witness, a private citizen, bought heroin from defendant during police investigation). Appellant contends that the fact that Deputy Pat-

berg did not specifically sanction Pressley's participation in the first staged accident means that she was not acting as an informant at the time and thus was an accomplice in regard to the offense. We find this to be a distinction without a difference on the facts of this case.

■ Pressley specifically testified that she participated in the staged accident because she wanted to be able to help gather information for the sheriff's office on the insurance fraud ring. She did not participate in order to share in the ill-gotten proceeds of the crime. Her testimony was fully supported by that of Deputy Patberg, whom she contacted before she participated in the accident and fully apprised of her planned activity. No contradictory evidence was submitted on this issue. It is clear that Pressley did not possess the requisite intent for the commission of the charged crime; she was attempting to obtain evidence to be used in a criminal prosecution, and she was not a "blameworthy participant." *See Blake,* 971 S.W.2d at 455; *see also Bogany v. State,* 36 S.W.3d 527, 529–30 (Tex.App.—Houston [1st Dist.] 2000, pet. granted), *judgment vacated* September 27, 2000 (finding no evidence in the record to suggest witnesses had the intent to participate in the criminal combination described in indictment); *Mize v. State,* 915 S.W.2d 891, 895 (Tex.App.—Houston [1st Dist.] 1995), *pet. refused,* 922 S.W.2d 175 (Tex.Crim.App.1996)(holding that evidence did not demonstrate witness's intent to commit theft as a matter of law but conflicting evidence on intent did raise fact issue for jury). Furthermore, there was no evidence suggesting that Pressley brought about the crime. *See Parr,* 606

---

**9.** The payment for her participation apparently went to Kenneth Johnson.

**10.** Theft can be considered a lesser included offense in a charge for organized criminal

activity to commit theft. *See Smith v. State,* 36 S.W.3d 908, 910 (Tex.App.—Houston [1st Dist.] 2001, pet. ref'd).

S.W.2d at 929. The trial court did not err in refusing to instruct the jury that Mary Pressley was an accomplice witness as a matter of law or a matter of fact. Accordingly, we overrule this point of error.

The judgment of the trial court is affirmed.

MAURICE AMIDEI, Justice (Assigned), dissenting.

I respectfully dissent. On rehearing, appellant requests that we reconsider our analysis of his point of error one. In point one, appellant complains that the trial court abused its discretion in disqualifying his attorney, Ralph Gonzalez, and thereby violated his constitutional right to an attorney of his choice. I would grant rehearing on this point and reverse and remand.

The trial court granted the State's motion to disqualify appellant's attorney, Ralph Gonzalez, pursuant to rule 3.08 of the Texas Disciplinary Rules of Professional Conduct. The State alleged that attorney Gonzalez (1) had instructed appellant to pay Percy Gonzalez, (Percy) an indicted coconspirator some money, and (2) had telephone conversations with Percy which he taped. After these conversations, Percy became a witness for the State. At the hearing on the motion, Percy claimed that attorney Gonzalez attempted to buy his testimony on behalf of the appellant, and attorney Gonzalez claimed the money paid and to be paid by appellant to Percy was to assist him in paying his attorney since he was indicted for matters allegedly arising out of his employment by appellant.

In granting the motion, the trial court apparently did not attempt to analyze and apply rule 3.08, but simply disqualified attorney Gonzalez concluding: "[A]s I read the rule, a lawyer cannot just act as a lawyer for a person if he is going to be a witness." The trial court properly exclud-

ed the testimony of Percy and attorney Gonzalez in regard to the issue in question but violated appellant's constitutional rights by refusing to allow attorney Gonzalez to continue as appellant's attorney. The exclusion of any testimony regarding the witness tampering issue removed any possible confusion of the jury or prejudice to the State or to the appellant. TEX.R. EVID. 403. It would have been an acceptable alternative had attorney Gonzalez been allowed to remain as appellant's attorney but disqualifying attorney Gonzalez was too drastic. See Harrison v. State, 788 S.W.2d 18, 23 (Tex.Crim.App.1990).

The majority believes that it is conceivable that appellant could have (1) urged a motion to exclude the witness tampering evidence prior to the time the trial court excluded such evidence on its own motion, or (2) brought a motion to reinstate attorney Gonzalez as counsel after the such evidence was excluded, but cites no authority to indicate appellant was required to make these motions in order to preserve appellant's complaint for appeal. The motions suggested by the majority, while conceivable, were not necessary because the record reflects that the trial court was fully aware of appellant's complaint when it heard and ruled on State's motion to disqualify; and appellant was not required to make a formal exception to the trial court's ruling or have the trial court reaffirm its disqualification order in a subsequent, separate order in order to preserve error. TEX.R.APP. P. 33.1(a)(c). Appellant's failure to make either of these motions is immaterial.

The exclusion of any testimony regarding the witness tampering issue did not deprive the State of a fair trial or otherwise effect its substantial rights. See House v. State, 947 S.W.2d 251, 253 (Tex. Crim.App.1997). In any event the State did not complain that the trial court's ex-

clusion of the testimony violated its substantial rights or deprived it of a fair trial.

The majority concludes the evidence clearly supports the trial court finding that attorney Gonzalez apparently was a "key witness" because of the conversations he had with Percy Gonzalez, the State's key witness against appellant. I disagree. While the allegation of "witness tampering" may have been "controversial and contested" as the majority concludes, the allegation was not as to a fact essential to appellant that would either preclude attorney Gonzalez from testifying in rebuttal to Percy's testimony or disqualify him under rule 3.08 from serving as appellant's attorney. The term "key witness" has no significance in connection with rule 3.08 as it is not defined therein, and is not supported by the law or the record. Neither was the allegation of "witness tampering" a fact essential to the State, although it was raised by the State. A lot was said about "witness tampering" in the motion to disqualify hearing but actually it turned out to be an uncontested, non-issue, and attorney Gonzalez was really not the "most important witness appellant had" as the trial court overstated unnecessarily at the hearing. The lawyer-witness prohibited by rule 3.08 is the lawyer who knows he is a witness necessary to establish an essential fact on behalf of his client. Since the fact in question is on behalf of the State, attorney Gonzalez is not a lawyer-witness who may be disqualified under the rule. The State did not prove attorney Gonzalez *knew or believed* that he was or may be a witness *necessary to establish an essential fact* on behalf of appellant, his client. The probabilities were that neither Percy nor attorney Gonzalez would be witnesses testifying about this unlikely issue. It is fairly obvious Percy was unlikely to testify because he and the State knew attorney Gonzalez had tapes of their conversations (one of which is in the record) to impeach Percy's testimony. Likewise, appellant had nothing to gain by raising this issue even though he had his attorney to counter Percy's testimony. The issue was not *essential* for either appellant or the State. This was proven because the State did not use Percy, and appellant did not use attorney Gonzalez to testify about these conversations. Therefore, it is apparent the State was using rule 3.08 as a tactical weapon to place appellant at a disadvantage by having his attorney disqualified. Perhaps the State believed its coconspirator witness needed to be protected but the issue in question was not something which appellant could be expected to raise. Appellant had the presumption of innocence, and was not required to establish any fact, essential or otherwise. Percy's testimony on the issue in question, in addition to not being essential to the State's case, would more likely have been a liability to the State, because, if impeached, it would weaken the balance of his testimony which was more important to the State.

The trial court abused its discretion in granting the motion to disqualify because: (1) the State failed to show the alleged violation of rule 3.08 by attorney Gonzalez would actually prejudice the State by depriving it of a fair trial or otherwise affect its substantial rights (*See House,* 947 S.W.2d at 253); and (2) the disqualification violated appellant's constitutional right to have counsel of his choice. As the State did not demonstrate prejudice, it was not necessary for the trial court to decide whether attorney Gonzalez violated a disciplinary rule. That is the domain of the Texas State Bar Association. The disciplinary rules do not grant standing or some "systemic" right to complain about an opposing party's alleged disciplinary rule violations that do not result in "actual prejudice" to the complaining party.

*House,* 947 S.W.2d at 253. The court of criminal appeals held in the *House* case:

> The rules should not be used as a tactical weapon to disqualify opposing counsel for their alleged disciplinary rule violations or to obtain a reversal of a conviction for alleged disciplinary rules violations by opposing counsel *unless the defendant can show the alleged disciplinary rule violations by opposing counsel deprived him of a fair trial or otherwise affected his substantial rights.*

*House,* 947 S.W.2d at 253 (emphasis added).

This holding applies equally to the State as well as to the defense. Appellant made this same point in his brief by substituting "State" for "defendant," and argued the rule should be applied impartially, but was criticized by the majority for "clouding the standard of review issue." Appellant's argument is well taken, and I would hold that the *House* case applies as appellant argues it does. Therefore, since the State did not prove "actual prejudice" as required by the *House* case, it was and is unnecessary to decide whether attorney Gonzalez's conduct violated a disciplinary rule. Appellant's point one should be granted.

> Rule 3.08(a) provides, in pertinent part:
> A lawyer shall not accept or continue employment as an advocate before a tribunal in a contemplated or pending adjudicatory proceeding if the lawyer *knows or believes* that the lawyer is or may be a witness *necessary to establish an essential fact on behalf of the lawyer's client,* unless:
> (1) the testimony relates to an uncontested issue;
> (2) the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence

will be offered in opposition to tne testimony;

Tex. Disciplinary R. Prof'l Conduct 3.08(a)(1) & (2), *reprinted in* Tex. Gov't Code Ann. tit. 2, subtit. G app. A (Vernon 1998 & Supp.2001) (Tex. State Bar. R. art. X, § 9) (emphasis added).

The purpose of the rule is to protect a client from any harm resulting from his own attorney if he testifies and assumes the dual role of advocate-witness. *See Harrison,* 788 S.W.2d at 24(there is no violation of the rule where it is not obvious that defense counsel might be a witness prejudicial to his client). There is no indication in the record that attorney Gonzalez's testimony would have been prejudicial to appellant had he testified.

*United States v. Peng,* 766 F.2d 82 (2d Cir.1985), cited by the majority, is not in point because the defense attorney in that case was shown to be a participant in an event relating to the alleged fraud perpetrated by the defendant on the victim which irreversibly injected his credibility as an issue in the trial. Whereas, in this case the defense attorney's credibility versus Percy's did not become an issue as the issue in question was of mere tangential importance to the case itself. *Harrison,* 788 S.W.2d at 23.

The majority believes the trial court was or should have been concerned of possible confusion of the trier of fact if attorney Gonzalez testified. It is difficult to see how the jury could have been confused. However, the jury could not have heard the testimony because the trial court excluded Percy's and attorney Gonzalez's testimony. *See* Tex.R. Evid. 403. By precluding this testimony, neither the State nor the appellant was unfairly prejudiced thereby.

Appellant claims the first and second exceptions to rule 3.08 are applicable to allow attorney Gonzalez's testimony even if

rule 3.08(a) is otherwise applicable. *See* TEX. DISCIPLINARY R. PROF'S CONDUCT 3.08(a)(1) & (2). Rule 3.08(a)(1) allows an attorney to testify to an uncontested issue. The issue in question was a nonissue, as discussed above. because neither party needed nor wanted to inject the matter into the trial. As it turned out it was a nonissue and *uncontested* because neither Percy nor attorney Gonzalez testified about the issue in question. The tape recordings of the conversations effectively neutralized the issue in question and thus made it uncontested.

Appellant did not waive any argument or error on the basis of what was contained in the tapes not admitted into evidence. Attorney Gonzalez's testimony and the tape that was admitted disclosed the content of the tapes and the trial court used the content of the tapes to disqualify attorney Gonzales. The content of the tapes is part of the record in this case. If the State had accepted attorney Gonzalez's offer to not testify no one would have been harmed. In that event, the witness tampering issue would not have been raised and appellant's right to an attorney of his choice would not have been violated. However, if Percy had testified as to that issue, attorney Gonzalez should have been allowed to testify in rebuttal. The hypothetical proposed by the majority that if attorney Gonzalez remained as appellant's attorney, cross examined Percy forcefully, and then did not testify himself, the jury would believe attorney Gonzalez's questions to Percy and his argument, to be attorney Gonzalez's version of the facts is in material and unrealistic. If attorney Gonzalez did not testify after such cross examination of Percy, we can not assume the jury would give more weight to attorney Gonzalez's version of the conversations, because he is an attorney. We could more likely assume the jury would not believe attorney Gonzalez if he did not testify because the State would have no doubt emphasized in argument his failure to testify. The State would not have been prejudiced to any degree even though attorney Gonzalez may not have been sworn and subjected to cross examination. And as the majority points out the State could have called attorney Gonzalez as a witness in the absence of an agreement to the contrary.

The second exception under rule 3.08(a)(2) allows an attorney to testify solely to a matter of formality, where there is no reason to believe that substantial evidence will be offered in opposition to the testimony. Appellant argues that attorney Gonzalez could have testified as a matter of formality to prove up a predicate for offering the conversation tapes into evidence, and there was no reason to believe that substantial evidence would have been offered in opposition thereto. If Percy refused to identify the voice on the tapes as his, appellant reasons that some person other than attorney Gonzalez familiar with Percy's voice could have authenticated the recordings under rule 901(b)(5), Texas Rules of Evidence. The predicate for the admissibility of the tapes could have been heard by the trial court out of the hearing of the jury without limiting the right of a party to introduce the evidence relevant to weight or credibility under rule 104 Texas Rules of Evidence.

There could not have been anything unusually confusing if the trial court had applied either of these exceptions.

By disqualifying attorney Gonzalez, the trial court violated appellant's constitutional right to counsel of his choice. The right of an accused in a criminal proceeding to the assistance of counsel is guaranteed by the Sixth Amendment to the United States Constitution, Article I, Section 10, of the Texas Constitution, and article 1.05, of the

Texas Code of Criminal Procedure. The right includes the freedom of choice in the selection of counsel by the accused. *See United States v. Sotelo,* 97 F.3d 782 (5th Cir.1996); *Ex Parte Prejean,* 625 S.W.2d 731, 733 (Tex.Crim.App.1981); *Childress v. State,* 794 S.W.2d 119, 121 (Tex.App.—Houston[1st Dist.] 1990, pet. ref'd). Unreasonable or arbitrary interference with the right to choose counsel rises to the level of a constitutional violation. *See Kozacki v. Knize,* 883 S.W.2d 760, 762–763 (Tex.App.—Waco 1994, no pet.).

I would sustain appellant's point one. Because the trial court error was of a constitutional dimension subject to harmless error review, we must reverse and remand because we cannot determine beyond a reasonable doubt that the error did not contribute to the conviction. Tex. R.App. P. 44.2(a).